Stephen **RASTALL**, et al., Appellants,

v.

**CSX TRANSPORTATION, INC.,** Appellee.

No. 89–261.

District of Columbia Court of Appeals.

Argued Feb. 14, 1990.
Decided May 8, 1990.

---

**10.** Rule 7.1(b)(3) carries over DR 2–103(A)(3)   without substantial change.

Richard A. Allen, with whom Sherrice A. Knisley was on the brief, for appellants.

Jack L.B. Gohn, with whom Steven M. Levine and H. Russell Smouse were on the brief, for appellee.

Before ROGERS, Chief Judge, and FERREN and FARRELL, Associate Judges.

FARRELL, Associate Judge:

This is an appeal from an order of the Superior Court granting summary judgment in favor of appellee, defendant below, CSX Transportation, Inc. (CSXT).[1] The action was brought by appellants Stephen Rastall and Timothy Gowdey, Canadian employees of CSXT, on behalf of themselves and all past, present and future Canadian employees,[2] and alleged a breach of provisions of a collective bargaining agreement between the company and its Canadian employees whereby CSXT purportedly had agreed to pay the wages, pensions and other benefits of the employees in United States dollars.[3]

Shortly after the complaint was filed, CSXT removed the case to the United States District Court for the District of Columbia asserting federal question jurisdiction, 28 U.S.C. § 1331 (1982),[4] on the

---

1. CSXT is a railroad company incorporated in Virginia. It operates 20,000 miles of track in the United States and 200 in the Canadian province of Ontario. CSXT employs approximately 34,000 people, 200 of whom are Canadian citizens who work entirely in Canada.

2. For simplicity, appellants will be referred to collectively as "the employees."

3. Jurisdiction was founded upon the fact that CSXT owns tracks and operates trains in the District of Columbia.

4. CSXT also sought to invoke the district court's diversity jurisdiction under 28 U.S.C. § 1332 (1982). Since many of the class members' claims were for less than $10,000, however, and since such claims cannot be aggregated for diversity purposes, diversity jurisdiction was lacking. *See Rastall v. CSX Corp.,* 696 F.Supp. 683, 684 (D.D.C.1988).

grounds that either the Railway Labor Act (RLA), 45 U.S.C. §§ 151–88 (1982), or the Labor Management Relations Act (LMRA), 29 U.S.C. §§ 185 *et seq.*, applied to the dispute and required the parties to submit disputes such as this one to arbitration.[5] The district court, however, remanded the case to the Superior Court after concluding that neither the RLA nor the LMRA has extraterritorial effect so as to apply to CSXT's Canadian employees. *Rastall v. CSX Corp., supra* note 4, 696 F.Supp. at 684–85.

CSXT renewed its motion to dismiss in the Superior Court, again asserting that arbitration of this dispute is mandated by either the RLA or the LMRA, thus depriving the courts of jurisdiction to rule on the breach of contract claim.[6] CSXT also contended that if United States labor law did not apply to Canadian employees, then the Canadian Labour Code applied and similarly required arbitration. The trial court declined to rule on the application of federal or Canadian law to the dispute, but instead concluded that the dispute resolution provisions of the labor contracts themselves required the parties to submit to binding arbitration. He therefore granted CSXT's motion for summary judgment.[7]

On appeal, the employees contend that the trial court erred in failing to heed the plain language of the collective bargaining agreements which, they assert, expressly gives Canadian employees the choice of submitting their grievances to arbitration or bringing an action in court. CSXT, on the other hand, while defending the trial court's contract interpretation, urges that the court lacked jurisdiction to rule on the

matter to begin with because the RLA deprives the courts of jurisdiction over "minor disputes" such as this one in favor of mandatory arbitration. In the alternative, CSXT contends that either the LMRA, federal common labor law, or the Canadian Labour Code applies to the present dispute and equally compels arbitration.

For the reasons set forth below, we reverse the grant of summary judgment in CSXT's favor and remand the case for further proceedings.

## I.

Before dealing with the interpretation of the dispute resolution provisions, we must address CSXT's argument that the Superior Court lacked jurisdiction to reach the contractual issues. Any such action, it contends, is preempted by the requirement of arbitration imposed by the RLA, the LMRA, or Canadian labor law. We are unpersuaded.

■ With regard to the RLA, we agree with United States District Judge Gesell that it does not apply to foreign employees performing services entirely outside the United States. 696 F.Supp. at 684. Indeed, the United States Court of Appeals for the District of Columbia Circuit expressly so held in *Air Line Dispatchers Ass'n v. National Mediation Bd.*, 89 U.S. App.D.C. 24, 29, 189 F.2d 685, 690 (1951), a holding that would appear to bind us. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1979). Even if we were not bound by *Air Line Dispatchers*, our own reading of the statute is in accord with its holding.[8] We

---

**5.** At the same time, CSXT filed a motion to dismiss with the district court arguing that the RLA, the LMRA, and the collective bargaining agreement itself mandated arbitration as the exclusive remedy in this type of dispute.

**6.** The employees do not contend that the district court's ruling on the application of the RLA and LMRA became law of the case or otherwise barred CSXT from relitigating the issue in Superior Court. *See* 28 U.S.C. § 1447(d) (order remanding case to state court from which it was removed not appealable).

**7.** CSXT had filed a motion to dismiss the complaint which the trial court treated as a motion

for summary judgment pursuant to Super.Ct. Civ.R. 12(b)(6) (1989).

**8.** The court in *Air Line Dispatchers* reasoned that the RLA defines "employee" as "every person in the service of a carrier ... who performs any work defined as that of an employee ... in the orders of the Interstate Commerce Commission...." 45 U.S.C. § 151, Fifth (1982). Since the jurisdiction of the Interstate Commerce Commission (ICC) is limited to transportation that is "in the United States," 49 U.S.C. § 10501(a)(2) (1982), the RLA has no extraterritorial effect. 89 U.S.App.D.C. at 29, 189 F.2d at 690.

are confirmed in that reading by the consistent body of federal law elsewhere holding that the RLA has no extraterritorial effect. *See Air Line Stewards & Stewardesses Ass'n v. Northwest Airlines,* 267 F.2d 170, 175 (8th Cir.), *cert. denied,* 361 U.S. 901, 80 S.Ct. 208, 4 L.Ed.2d 156 (1959); *Vollmar v. CSX Transp., Inc., supra* note 8, 705 F.Supp. at 1164–65; *General Comm. on Adjustment v. United States,* 102 L.R. R.M. 2869, 2871, 1979 WL 1862 (D.Minn. 1979), *aff'd,* 620 F.2d 161 (8th Cir.), *cert. denied,* 449 U.S. 826, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980); *Air Line Stewards & Stewardesses Ass'n v. Transworld Airlines,* 173 F.Supp. 369, 374–78 (S.D.N.Y.), *aff'd,* 273 F.2d 69 (2d Cir.1959), *cert. denied,* 362 U.S. 988, 80 S.Ct. 1075, 4 L.Ed.2d 1021 (1960).

■ With regard to the LMRA, its application to foreign employees is doubtful, *Windward Shipping Ltd. v. American Radio Ass'n,* 415 U.S. 104, 110, 94 S.Ct. 959, 963, 39 L.Ed.2d 195 (1974); *Benz v. Campania Naviera Hidalgo,* 353 U.S. 138, 144, 77 S.Ct. 699, 702, 1 L.Ed.2d 709 (1957). We need not stop to consider that issue, however, because even if applicable in the present context, the LMRA contains no language requiring arbitration in the face of an agreement providing otherwise, nor does CSXT so contend. It merely asserts

> We reject CSXT's argument that this interpretation of the "in the United States" language in defining the ICC's jurisdiction has been undermined by a footnote in *Trailer Marine Transp. Corp. v. Federal Maritime Comm'n.,* 195 U.S. App.D.C. 201, 211 n. 46, 602 F.2d 379, 389 n. 46 (1979). That case (which was decided post-*M. A.P. v. Ryan*) involved an interagency dispute between the ICC and the Federal Maritime Commission over jurisdiction to regulate rates on "joint through" routes between ports in the United States and Puerto Rico. Such routes are defined as "through movement of cargo from a point of origin on the line of one carrier to a point of destination on the line of the other." *Id.* at 203 n. 1, 602 F.2d at 381 n. 1 (citation omitted). The court construed the Interstate Commerce Act as "conferring plenary jurisdiction on the ICC over both the rail and water segments of Puerto Rico-to-inland United States joint through trade." *Id.* at 208, 602 F.2d at 386. The footnote relied on by CSXT (note 46) merely pointed out that the ICC has been held to have jurisdiction over domestic carriers participating in joint through trade passing overland

that, "[u]nder the LMRA, the Appellants would certainly be required to arbitrate *under any agreement which called for arbitration ....*" Since, as we demonstrate later, the present agreement does not require Canadian employees to submit their disputes to arbitration, the argument that arbitration is mandated by the LMRA is without merit.[9]

Lastly, we reject CSXT's argument that the Canadian Labour Code, R.S.C. 1970, c. L–1, requires the parties to submit to binding arbitration. It is unnecessary to consider the employees' contention that, under choice of law principles, it is not Canadian law but the law of Maryland, Michigan, and the District of Columbia that governs whether this dispute was required to be arbitrated. Assuming *arguendo* that Canadian law applies, it too does not require arbitration in the face of an agreement providing otherwise.

Section 155(1) of the Canadian Labour Code provides:

> Every collective agreement shall contain a provision for final settlement without stoppage of work, by arbitration *or otherwise,* of all differences between the parties to *or* employees bound by the collective agreement, concerning its interpretation, application, administration or alleged violation. [Emphasis added.]

> between the United States and adjacent countries. Recognition of that jurisdiction does not conflict with the basic territorial limitation on the ICC's jurisdiction over transportation solely in another country, or with the *Air Line Dispatchers* decision construing the RLA. *See Vollmar v. CSX Transp. Inc.,* 705 F.Supp. 1154, 1164–65 n. 31 (E.D.Va.1989).

**9.** We also reject the argument that federal common labor law would require arbitration of the present dispute. To the extent Congress has seen fit to exclude foreign workers from the reach of federal labor laws, courts may not properly alter that policy through application of federal common law. *See Textile Workers of America v. Lincoln Mills of Alabama,* 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1956) (federal common labor law "is fashioned from the policy of our national labor laws"). In any event, CSXT cites nothing in the "policies of federal law" requiring arbitration of a contract dispute where, as we conclude here, the pertinent agreements specifically permit the employees to bypass arbitration.

In *St. Anne Nackawic Pulp & Paper Co. Ltd. v. Canadian Paper Workers Union Local 219*, [1986] S.C.R. 704, 723, the Canadian Supreme Court, interpreting the identical phrase in section 55(1) of the New Brunswick Labour Relations Act, N.B. REV.STAT.1973, c. 1-4, stated:

> What the statute does is to establish a preference for arbitration of a particular sort over other means of dispute settlement, by establishing a procedure to be followed where the parties do not expressly provide for any other method of resolving their differences. Where the parties [have chosen otherwise], however, the New Brunswick Act, in common with most of the other Canadian labour relations statutes, does not actually require the parties to resort to arbitration. It requires a provision in the collective bargaining agreement for "final and binding settlement by arbitration *or otherwise*, without stoppage of work". The emphasized words indicate that, if they so choose, the parties may validly provide for a variety of other sorts of settlement mechanisms, including recourse to the courts. [Emphasis in original.]

As this language makes clear, Canadian labor law expresses a preference for arbitration but does not mandate it where the collective bargaining agreement negotiated by the parties specifically permits an alternative form of dispute resolution, including recourse to the courts.[10]

## II.

### A.

We thus turn to the question of whether appellants are contractually bound to arbitrate the present dispute. At issue are

twelve collective bargaining agreements governing relations between the Canadian employees and CSXT, which became effective around 1955. The crafts represented in the dispute include the Carmen, Clerks, Dispatchers, Locomotive Engineers, Locomotive Firemen, Oilers, Mechanical Employees, Maintenance of Way Employees, Signalmen, Supervisors, Trainmen and Yardmen. The bargaining agreements contain two types of dispute resolution provisions. The most common, found in seven of the agreements, is exemplified by Rule 32 of the agreement with the Brotherhood of Railway Carmen. Rule 32(1)(c) provides, in relevant part:

> All claims or grievances involved in a decision by the highest designated officer shall be barred unless within 9 months from the date of said officer's decision proceedings are instituted by the employee or his duly authorized representative before the appropriate division of the National Railroad Adjustment Board or a system, group or regional board of adjustment that has been agreed to by the parties hereto provided in Section 3 Second of the Railway Labor Act.

Rule 32(4), however, provides:

> This Rule is not intended to deny the right of the employees to use *any other lawful action* for the settlement of claims or grievances provided such action is *instituted* within 9 months of the date of the decision of the highest designated officer of the Carrier. [Emphasis added.]

The other five agreements contain language exemplified by Rule 98(c) of the agreement with the Brotherhood of Locomotive Engineers, which provides in part:

---

**10.** Although CSXT cites to Canadian decisions that required arbitration of particular labor disputes, such as *Brunet v. General Motors of Canada*, [1977] 2 S.C.R. 537, *Bartello v. Canada Post Corp.*, [1987] C.C.E.L. 26 (Ont.H.C.), *Bourne v. Otis Elevator Co.*, [1984] 45 O.R.(2d) 321 (Ont.H. C.), and *Close v. Globe & Mail Ltd.*, [1966] 60 D.L.R.(2d) 105, 1 O.R. 235 (Ct.App.), many of the cases involve interpretations of provincial labor codes with language different from the applicable provision in the Canadian Labour Code. In Ontario, for example, where many of these cases were decided, the Labour Relations Act, Ont.Rev.Stat.1980, c. 228, does not contain the "or otherwise" language of the national code. The cases cited are also distinguishable in that the collective bargaining agreements at issue there either required arbitration of disputes or were silent on the question of how a particular dispute should be resolved.

Decisions by the highest officer designated to handle claims and grievances shall be final and binding unless within sixty days after written notice of the decision of said officer he is notified in writing that his decision is not accepted. All claims or grievances involved in a decision of the highest officer shall be barred unless within six months from the date of said officer's decision proceedings are instituted by the employee or his duly authorized representative *before a tribunal having jurisdiction pursuant to law* or agreement of the claim or grievance involved. [Emphasis added.]

In his order granting summary judgment,[11] Judge Weisberg concluded that "[t]hese contracts are not ambiguous. Plaintiffs are required to arbitrate this minor dispute ... because the collective bargaining agreements between their unions and the company require arbitration." In reaching this conclusion, the judge was unpersuaded by the agreements' reservation to the employees of the right to institute "any other lawful action ... within 9 months" (Carmen's agreement) or "proceedings ... before a tribunal having jurisdiction pursuant to law" (Engineers' agreement). He reasoned:

> To accept plaintiffs' position, the court would have to find that these parties bargained for a dispute resolution process in which the Railroad's 32,000 American employees, who are covered by the Railway Labor Act, are forced to arbitrate contract disputes such as this, but its 200 Canadian employees can either arbitrate or go to court, whichever they prefer. If the parties expressly wrote such an unusual dichotomy into their contract, they would of course be held to the benefits and burdens of their agreement, and the court would be obligated to uphold it; but the language relied on by plaintiffs, which differs from agree-

ment to agreement, certainly does not compel that result.

The court made the same point later:

> [I]t is implausible, to say the least, that these unions could have bargained with the Railroad for a dispute resolution provision that would require the Railroad's 32,000 American employees to submit minor disputes such as this one to final and binding arbitration, but would permit the 200 Canadian employees to bypass arbitration and opt for court litigation. Moreover, even if the unions would have had some unknown reason for favoring a tiny minority of their members over the majority, it is hard to imagine why the Railroad would have agreed to such a system. Where, as here, plaintiffs' interpretation of those contracts ignores the realities of the marketplace of collective bargaining and goes against the Railway Labor Act and the strong policy favoring arbitration embedded in both American and Canadian labor law, it is not unreasonable for the court to demand some evidence in the contract itself or in the circumstances surrounding the making of the contract that this interpretation was intended by the contracting parties. Plaintiffs have offered nothing, except to argue that the right of the Canadian employees to bypass arbitration is hidden in the folds of the contracts in language which, in context, can not mean what they say it means.

The court concluded:

> To create a right to litigate this dispute in court out of the obscure language relied on by plaintiffs would amount to nothing less than rewriting the contracts, when the agreements themselves say, in language that could not be much clearer, that arbitration is the exclusive method for resolving disputes arising under the contracts.

## B.

■ There is no dispute that the RLA applies to American employees of CSXT

---

**11.** Judge Weisberg actually issued two orders. In the first, filed on January 11, 1989, he expressed his inclination to grant summary judgment in favor of CSXT but allowed the employees an opportunity to present any materials rele-

vant to the question whether the contracts required arbitration. On March 1, 1989, concluding that the employees had not presented any new materials identifying a genuine issue of

and to CSXT itself,[12] and requires that "minor disputes,"[13] such as the one involved in this case, be resolved through arbitration. It is also true, as the trial court remarked, that the employees can point to nothing in the negotiations surrounding these agreements confirming an intent to treat the Canadian employees differently from their American counterparts. There is simply no history one way or the other.[14] We can further agree with the trial court and CSXT that the agreements were drafted against the background of a longstanding "congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration," *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960), a policy embodied in the LMRA and—as to minor disputes— even more strongly in the RLA. *Andrews v. Louisville & Nashville R.R.*, 406 U.S. 320, 323, 92 S.Ct. 1562, 1564, 32 L.Ed.2d 95 (1972). *See 1901 Wyoming Ave. Coop. Ass'n v. Lee*, 345 A.2d 456, 461–62 (D.C. 1975) ("there is a presumption that the reasonable person knows all the circumstances surrounding the making of the contract"). We can also agree with CSXT that "[a] collective bargaining agreement is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate," *United Steelworkers, supra*, 363 U.S. at 578, 80 S.Ct. at 1350, and that one eventuality the parties likely did not anticipate—to quote CSXT—"was that Canadian employees might seek to avoid the arbitral mechanisms of the contracts."

■ Having conceded all of this, however, we cannot agree with the trial judge that these agreements limit the methods of formally resolving minor disputes to arbitration. Notwithstanding federal labor policy generally and "the realities of the marketplace of collective bargaining," we conclude that the agreements are unambiguous in leaving the employees the choice of submitting their grievances to arbitration or resolving them in court.

It is apparent at the outset that it is not the agreements themselves that create the dichotomy between American and Canadian employees which the trial court found anomalous; rather it is the RLA, which courts at least since 1951 have interpreted not to apply to non-United States citizens performing work outside the United States. *See* part I, *supra*. Thus the fact that the agreements, if applied to American employees, would contravene the RLA is not grounds on which to disregard the plain meaning of their language. When an agreement is "facially unambiguous, its language should be relied upon as providing the best objective manifestation of the parties' intent." *1010 Potomac Assoc. v. Grocery Mfrs. of Am.*, 485 A.2d 199, 205 (D.C.1984). Rule 32 of the Carmen's agreement, while requiring resort to arbitration by either the employee or his representative (the union), expressly reserves to the employee the right to pursue *any other lawful action* for the settlement of a claim or grievance. Rule 98(c) of the Engineers' agreement, while not mentioning arbitra-

---

material fact, the judge entered summary judgment in favor of CSXT.

**12.** *See* 45 U.S.C. § 151, First, Fifth, for the definitions of "carrier" and "employee".

**13.** A "minor" dispute under the RLA involves a disagreement over the interpretation of a collective bargaining agreement, as distinct from a dispute "over the formation of collective agreements or efforts to secure them." *See Elgin, Joliet & Eastern Ry. v. Burley*, 325 U.S. 711, 722–24, 65 S.Ct. 1282, 1289–90, 89 L.Ed. 1886 (1945).

**14.** As CSXT acknowledges in its brief, the "dispute resolution provisions of each contract are now decades old, and no one now associated with the railroad has personal recollection or knowledge concerning the negotiation of these provisions." Similarly, in a letter responding to discovery inquiries, CSXT's attorney stated:

there are no known notes or records relating to the negotiation of the provisions in the various collective bargaining agreements as to grievance resolution specifically relating to Canadian employees. Indeed it is my understanding that there are no such documents relating to U.S. employees, either. The truth is that all of these agreements are decades old, and the substantive bargaining over dispute resolution provisions in these agreements took place in eras as to which no records now exist and no one currently employed by CSXT was involved in those negotiations.

tion at all, similarly allows the employee or his representative to institute proceedings *before a tribunal having jurisdiction pursuant to law* over the claim or grievance. There is nothing arcane or obscure about these phrases,[15] nor are they "hidden in the folds of the contracts" as the trial judge believed. They are an express reservation of non-arbitration remedies to the employees, and as such they qualify the earlier, seemingly mandatory provision of the Carmen's agreement for arbitration.

A similar issue was presented in *Independent Oil Workers v. Mobil Oil Corp.*, 441 F.2d 651 (3d Cir.1971), in which the court interpreted a dispute resolution provision containing both a mandatory arbitration clause and a clause stating that "[n]othing in this agreement shall prevent either Company or Union ... from applying ... to a court of competent jurisdiction for the relief to which such party may be entitled...." *Id.* at 652 n. 3. The court, while acknowledging the preference for arbitration under federal labor law, held that this "qualification ... takes away the mandatory aspect of the contractual grievance procedures" and creates "an 'escape' clause which nullifies the mandatory terms of the earlier language and makes arbitration optional." *Id.* at 653, 654. We read the pivotal language of the instant agreements in the same way. The federal policy favoring arbitration "would not ... preclude ... [an employee's] court suit if the parties to the collective bargaining agreement expressly agreed that arbitration was not the exclusive remedy," *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 657–58, 85 S.Ct. 614, 618–19, 13 L.Ed.2d 580 (1965); *see Vollmar v. CSX Transp., supra* note 8, 705 F.Supp. at 1170, and we conclude that that is what transpired here.

The alternative readings of the relevant language offered by the trial court and CSXT are not persuasive. The trial court found it "much more reasonable ... to interpret Rule 32(4) simply as a contractual recognition of the employee's right under the [RLA] to pursue a grievance *even* in cases where his union declines to pursue it" (emphasis added). But as the district court recognized in *Vollmar v. CSX Transp., supra* note 8, this reading makes Rule 32(4) of the principal agreement superfluous because Rule 32(1)(c) already allows an "employee *or* his duly authorized representative" (emphasis added) to file a claim or grievance. 705 F.Supp. at 1170 n. 54; *see* RESTATEMENT (SECOND) OF CONTRACTS § 203(a) (1981) (interpretation giving effect to all terms is preferred over one leaving one part of no effect). Nor can we give proper effect to the language by reading it—as CSXT urged below—as preserving the employee's right to go to court in the rare situations where courts have recognized exceptions to mandatory arbitration provisions. That too would make the language essentially redundant. Finally, CSXT argues that Rule 32(4) is only "intended to enable an individual employee to *settle* grievances" (emphasis by CSXT), *i.e.*, with the employer, "even if the union would prefer to pursue them," and that the term "lawful action" does not mean "lawsuit" but rather "some deed which accords with the law" in the sense that it is not an unfair labor practice. The provision, however, refers to the "settlement of claims" by means of "institut[ing]" an "action", which cannot plausibly mean simply reaching an agreement with the employer.

█ The fact that "in retrospect [the] agreement[s do] not seem favorable [to CSXT] does not give ... this court the right to reinterpret clear and unambiguous contractual language." *E.P. Hinkel & Co. v. The Manhattan Co.,* 165 U.S.App.D.C. 140, 144, 506 F.2d 201, 205 (1974). We hold that the agreements reserve to the employees the right to bypass arbitration in favor of resolving disputes in court. Accordingly, we reverse the order of the Superior Court and remand the case for further proceedings.

*So ordered.*

---

**15.** CSXT asserts that the phrase "claim or grievance" in Rule 98(c) is, "[i]n railroad vocabulary, ... arbitration terminology," but provides no case or other support for this assertion.